**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **RONDELL MILEY,** | : | |
| **PLAINTIFF,** | : | |
| | : | **CIVIL ACTION NO.** |
| **v.** | : | **3:12-CV-00519 (VLB)** |
| | : | |
| **HOUSING AUTHORITY OF THE** | : | |
| **CITY OF BRIDGEPORT and** | : | |
| **NICHOLAS CALACE,** | : | |
| **DEFENDANTS.** | : | **FEBRUARY 7, 2014** |

### MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Dkt. #54]

### I.   Introduction

The plaintiff, Rondell Miley ("Miley"), brings this action for violation of his Fourteenth Amendment procedural due process rights stemming from his termination from public employment with the Bridgeport Housing Authority allegedly absent good cause.  The sole remaining defendant is Bridgeport Housing Authority Executive Director Nicholas Calace ("Calace"), sued in his individual capacity.  Currently pending before the Court is Calace's Motion for Summary Judgment.  For the reasons that follow, the defendant's Motion for Summary Judgment is GRANTED.

### II.   Procedural Background

A preliminary explanation of the procedural background of this case is necessary.  This case was removed to federal court on April 5, 2012 and plaintiff

1

alleged four claims: a state statutory claim for retaliation under the Connecticut Workers' Compensation Act, Conn. Gen. Stat. § 31-290 and three federal law claims, two pursuant to 42 U.S.C. § 1983 for violation of procedural due process by virtue of the manner in which Miley's employment was terminated, and one stigma-plus due process claim.  Miley filed a motion to remand and the defendants filed two motions to dismiss Miley's claims.  On February 25, 2013 the Court issued an order severing and remanding Miley's statutory Workers' Compensation Act claim.  [Dkt. 39, 2/25/13 Memo. of Decision, p.12].  The Court also granted the defendants' motions to dismiss the plaintiff's stigma-plus due process claim, and his municipal liability procedural due process claims pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) against the Housing Authority and defendant Calace in his official capacity.  [Dkt. 39, 2/25/13 Memo. of Decision, pp.20, 21].  Lastly, the Court dismissed the procedural due process claim against Calace in his individual capacity but granted plaintiff leave to amend.  [*Id*. at pp.23-24].  The Plaintiff filed an amended complaint in which he re-pled the due process claim and included the dismissed claims.  [Dkt. 43, Am. Compl.].  Pursuant to the Court's order on the motions to dismiss, though, the only viable claim remaining to Miley was the procedural due process claim against defendant Calace in his individual capacity, which the Court gave plaintiff leave to amend.

Federal Rule of Civil Procedure 15 allows a party to amend its pleading once as a matter of course within 21 days after serving it, or within 21 days after service of a motion under Rule 12(b).  Fed. R. Civ. P. 15(a)(1).  In all other cases, a

party may amend its pleading only with the opposing party's written consent or the court's leave.  Fed. R. Civ. P. 15(a)(2).  Here, the Court granted Miley leave to amend only his procedural due process claim encompassed in count three and dismissed outright the claims he had alleged in counts one and two.  Miley did not seek the Court's leave to amend counts one or two, and no evidence exists in the record that defendant Calace (the only remaining defendant at this stage of the litigation) gave his written consent for amendment of these two claims, nor has Miley *actually* amended these claims.  In fact, in defendant Calace's Answer to the Amended Complaint, rather than admitting or denying the allegations in counts one and two, Calace has instead noted that these counts were remanded and dismissed pursuant to this Court's February 25, 2013 Order.  [Dkt. 47, Answer].

By way of clarification, because the Court has previously remanded and dismissed Miley's state statutory, municipal liability, and stigma-plus due process claims and only allowed Miley to amend his procedural due process claim against defendant Calace in his individual capacity, and further because Miley did not seek leave of the Court to amend his previously dismissed claims, the *only* claim remaining in this case is Miley's procedural due process claim against Calace in his individual capacity.  As such, the Court construes the inclusion of the dismissed claims as an attempt to preserve Miley's appeal rights and will therefore consider only Miley's procedural due process claim in adjudicating defendant Calace's motion for summary judgment.

III. __Factual Background__

3

The facts relevant to the Defendant's Motion for Summary Judgment are set forth below and are undisputed unless otherwise noted.  Where the plaintiff has objected to defendant's facts but has failed to support his objection with a citation to specific and admissible evidence in the record, or where the record does not support plaintiff's denials, those facts are deemed to be admitted.[1]

Rondell Miley commenced employment with the Housing Authority of the City of Bridgeport ("Housing Authority") on or about October 2006 and was employed as a maintenance aide.  [Dkt. 54-4, D's 56(a)(1) Stmt. ¶¶1, 3].  The Housing Authority is a municipal housing authority created pursuant to Conn. Gen. Stat. § 8-40 and provides affordable housing to low and moderate income citizens and those with disabilities through its public housing choice voucher, a/k/a Section 8, programs.  [*Id.* at ¶2].  As a Housing Authority employee, Miley was part of a bargaining unit represented by Local 2311 of Council 4 of the American Federation of State, County and Municipal Employees, AFL-CIO (the "Union"), and the times, wages, hours and terms of Miley's employment were governed by a collective bargaining agreement (the "Local 2311 Agreement" or

---

[1] The Court notes that each statement of material fact in a party's Local Rule 56(a)1 or (a)2 statement, as well as each denial in a summary judgment opponent's Local Rule 56(a)2 statement, "must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial." D. Conn. L. Civ. R. 56(a)3.  The Local Rule further clarifies that "[a]ll material facts set forth in [a moving party's 56(a)1] statement and supported by the evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party." D. Conn. L. Civ. R. 56(a)1.  Where a party fails to appropriately deny material facts set forth in the moving party's 56(a)1 statement, and where those facts are supported by evidence in the record, those facts are deemed to be admitted.  *See SEC v. Global Telecom Servs. L.L.C.*, 325 F. Supp. 2d 94, 109 (D. Conn. 2004); *Knight v. Hartford Police Dep't*, 3:04CV969 (PCD), 2006 WL 1438649 (D. Conn. May 22, 2006).  .

"Agreement") between the Housing Authority and the Union.  [*Id.* at ¶¶4, 5].  The Local 2311 Agreement provides that "[a]ll disciplinary actions shall be for just cause, and shall be applied in a fair manner and shall be consistent with the infraction for which the disciplinary actions are being applied."  Disciplinary actions include discharge from employment.  [*Id.*].  Pursuant to the Agreement's grievance procedure, if a grievance is not resolved following exhaustion of various preliminary steps, the Union may refer the dispute to the Connecticut State Board of Mediation and Arbitration whose decision will be final and binding. [*Id.* at ¶7].  This arbitration procedure is governed by Conn. Agencies Regs, §§ 31-91-1, *et seq.*

On September 15, 2011, Mr. Miley reported to the Bridgeport Police Department that on September 13, 2011 he had been punched in the mouth by a Travon Smith, causing a swollen upper lip.  [Dkt. 54-3, Exh. H, Incident Report; Dkt. 54-4, D's 56(a)(1) Stmt. ¶8].  Seven days after the first incident, on September 20, 2011 Miley sustained a second injury while he and a Housing Authority co-worker, Miguel Fernandez, were moving a refrigerator up some stairs at the end of the work day.  The plaintiff was at the top, and his coworker, who was at the bottom, pushed up on the refrigerator, causing the refrigerator to hit Miley on the left side rib area.  [Dkt. 54-4, D's 56(a)(1) Stmt.¶9].  Miley said to his coworker, "Mike, I think I hurt myself," to which the coworker replied "Come on, Rondell. Man up now, man up," meaning that he and Miley should finish the job.  [*Id.* at ¶10].

The plaintiff and defendant dispute when Miley reported this injury to the Housing Authority.  Miley contends that he reported the injury to Robbi Dunn Harris, his immediate supervisor, on the day after the workplace incident, September 21, 2011, but that she did not create a record of the injury until September 27, 2011.  [Dkt. 66, P's 56(a)2 Stmnt. ¶ 11; Dkt. 60-1, Miley Aff. ¶6].  The defendant contends that Miley did not report this injury to either his supervisor or Human Resources until September 27, 2011.  [Dkt. 54-2, Exh. E, Termination Letter, pp.30, 31/37].

On September 21, 2011 (and after he had reported his workplace injury to Dunn Harris, according to Miley) Miley was involved in a verbal dispute with his manager, Jorge Colon.  [Dkt. 54-4, D's 56(a)(1) Stmt. ¶12; Dkt. 66, P's 56(a)2 Stmnt. ¶12; Dkt. 60-1, Miley Aff. ¶7].  Following the dispute, Miley met with the Housing Authority's Human Resources Director, Robyn Stewart, complained of unfair treatment by Colon, and requested a transfer to a different department.  [Dkt. 54-4, D's 56(a)(1) Stmt. ¶13; Dkt. 66, P's 56(a)2 Stmnt. ¶12; Dkt. 60-1, Miley Aff. ¶8].  At this meeting, Miley did not mention anything about being injured the previous day.  [Dkt. 54-4, D's 56(a)(1) Stmt. ¶¶14, 15].  Stewart authorized him to take the following day, September 22, 2011, off from work, which he did.  [*Id.*].  Miley has submitted an affidavit asserting that, because he reported his injury to his manager, Robbi Dunn Harris, pursuant to Housing Authority procedures,[2] there was no need to report it to Human Resources.  [Dkt. 66, P's 56(a)2 Stmnt. ¶¶14, 15].  As a result of the incident between Colon and Miley, Ms. Dunn Harris

---

[2] These procedures are not contained in the record of this case.

changed Miley's supervisor from Jorge Colon to herself.[3]   [Dkt. 66, P's 56(a)2 Stmnt. ¶12; Dkt. 62-1, Dunn Harris email 9/21/11].

On the night of September 22, 2011, the day following the incident with Colon, Miley first sought medical treatment at the emergency room of St. Vincent's Medical Center in Bridgeport, accompanied by his girlfriend and his sixteen year old daughter.  [Dkt. 54-4, D's 56(a)(1) Stmt. ¶16].  The Triage section of the medical records from this visit states "history is provided by the patient" and notes as Miley's chief complaint (and as recorded by a triage nurse) "something's up with my rib, every time i [sic] cough it hurts – i [sic] did have a fight a couple of days ago and ever since then it has been hurting."  [Dkt. 54-4, D's 56(a)(1) Stmt. ¶18; Dkt. 54-2, Exh. B, St. V's Records 9/22/11, p.18/37].  The History of Present Illness section of the records from this visit, recorded by another member of the hospital's treatment team, emergency room physician Sally S. Chao, MD, included a more detailed statement of the reported cause of Miley's symptoms, "33 yo male presents with left lateral rib pain x 1 week s/p trauma.  pt was in a fight 1 week ago and was punch [sic] in left ribs."  [Dkt. 54-4, D's 56(a)(1) Stmt. ¶19; Dkt. 54-2, Exh. B, St. V's Records 9/22/11, p.19/37].

Human Resources Director Robyn Stewart has affirmed in an affidavit accompanying the defendant's motion for summary judgment that when a Housing Authority employee seeks treatment at St. Vincent's Medical Center for an on-the-job injury, St. Vincent's practice is to contact Stewart in the human

---

[3] Miley does not explain why he reported his injury to Dunn Harris earlier in the day, when she had not yet become his supervisor.

resources department to report that fact and to obtain workers' compensation information.  [Dkt. 54-4, D's 56(a)(1) Stmt. ¶20; Dkt. 54-3, Stewart Aff. ¶12]. Stewart also attests that when a Housing Authority employee seeks medical treatment for an on-the-job injury, the employee is supposed to inform the medical care provider that the injury is work related and is not supposed to use his or her group medical insurance card.  [Dkt. 54-4, D's 56(a)(1) Stmt. ¶22]. Stewart further affirms that she was not notified of Miley's visit to St. Vincent's on September 22.  [*Id.* at ¶21; Dkt. 54-3, Stewart Aff. ¶12].  Miley has submitted an undated invoice/bill from St. Vincent's Medical Center for services rendered on September 22, 2011 indicating his first insurance coverage to be "Workers' compensation Othr," and further reflecting that the claim for this date was paid by workers' compensation.  His second insurance coverage is listed on this document as "Blue Cross Shield of CT."  [Dkt. 66, P's 56(a)2 Stmnt. ¶ 22; Dkt. 61-1, Exh. F. St. V's Bill, p. 33/56].

The following day, Friday, September 23, 2011, Miley took a scheduled vacation day.  [Dkt. 54-4, D's 56(a)(1) Stmt. ¶23].  Upon his return to work on Monday, September 26, 2011, Robyn Stewart attests that she advised Miley that it did not look like his transfer request from Jorge Colon's department was going to be granted and that the staff with whom Stewart had spoken did not corroborate Miley's allegations of unfair treatment and harassment against supervisor Colon. [Dkt. 54-4, D's 56(a)(1) Stmt. ¶24; Dkt. 54-3, Stewart Aff. ¶8].  Miley then worked a full shift the following day, Tuesday, September 27, 2011.  [Dkt. 54-4, D's 56(a)(1) Stmt. ¶25].

On September 28, 2011 the plaintiff visited his personal physician's office and again complained of rib pain, this time reporting that it was the result of a workplace injury sustained while he and a co-worker were lifting a refrigerator on September 20, 2011.  The physician recommended that Miley remain out of work for six to eight weeks.  [Dkt. 54-4, D's 56(a)(1) Stmt. ¶27].  That same day, Miley reported to Human Resources Director Stewart that he had injured his ribs on the job on September 20, 2011 and gave her a copy of the note from his personal physician's office stating that he could return to work in six to eight weeks.  [*Id*. at ¶28].

On September 29, 2011 Miley returned to the St. Vincent's Medical Center emergency room for the treatment of the same rib injury and complaining of shortness of breath.  [*Id*. at ¶29].  Although the defendant contends, and the plaintiff agrees, that Miley told the St. Vincent's triage nurse on September 29, 2011 that he injured his ribs at work, neither party has cited evidence in the record supporting this contention.  [See Dkt. 54-4, D's 56(a)(1) Stmt. ¶30; Dkt. 66, P's 56(a)2 Stmnt. ¶30].   Mr. Miley was absent from work on workers' compensation leave from September 27, 2011 until November 29, 2011, when he returned to full duty work at the Housing Authority.  [Dkt. 54-4, D's 56(a)(1) Stmt. ¶35].  During this absence, Miley received workers' compensation benefits.  [*Id*. at ¶36].

In October 2011, the Housing Authority's Deputy Executive Director, Blanca Carrasquillo, informed Human Resources Director Stewart of a rumor circulating at work that Mr. Miley was injured in a fight outside the workplace and not on the

job, and requested that Stewart call Chartis, the Housing Authority's workers' compensation carrier, to have Chartis investigate the matter.  [Dkt. 54-4, D's 56(a)(1) Stmt. ¶31].  Stewart called the adjuster at Chartis assigned to Miley's workers' compensation claim, reported the rumor, and requested that the rumor be investigated.  [*Id.* at ¶32].  Investigator James Harris was assigned by Chartis to investigate the rumor.  [*Id.* at ¶33].  Harris met with Stewart, reviewed copies of portions of Miley's medical records from his September 22 and 29 visits to St. Vincent's Medical Center, and has attested that he unsuccessfully attempted to contact Mr. Miley.  [*Id.* at ¶34].  Harris also attempted to obtain from the Bridgeport Police Department a copy of the police report detailing the September 13 altercation involving Miley, but was unable to locate a report.  [*Id.*; *see also* Dkt. 62-1, P's Exh. N, Harris Report].

In February 2012 Harris wrote a memorandum to the Connecticut "Chief States Attorneys Office Workers Comp Fraud Bureau" entitled Summary of Investigation, and also emailed a copy to Robyn Stewart.  [Dkt. 54-4, D's 56(a)(1) Stmt. ¶37; *see also* dkt. 54-3, Exh. G, Harris Memo, p.39/47].  This Summary of Investigation reports that Harris obtained the September 22, 2011 St. Vincent's report indicating that Miley had sought treatment at the emergency room and "told medical staff that he had been in a fight a few days prior and since that time had chest pain."[4]  [Dkt. 54-3, Exh. G, Harris Memo, p.39/47].  The Summary also indicates that Harris reviewed Miley's medical records from September 28 and 29,

---

[4] Neither party has included the details of this report in their Local Rule 56 Statements.  However, as Miley bases his allegations in large part on certain statements contained in this report, the Court must explain its contents.

2011, and noted that Miley had reported to Robyn Stewart on September 27, 2011 that he had injured his ribs at work on September 20.  [*Id.*].  The report further states that Harris interviewed Robyn Stewart, who reported that Miley "has been the subject of prior workers comp claims and several disciplinary actions," and that "there were rumors" that Miley had been involved in a fight "but no employee would give a statement."  [*Id.*].  Harris noted that Stewart "had questions regarding the hospital report as she said St. Vincents [sic] always contacts her regarding a workers comp claim."  [*Id.*].  Lastly, investigator Harris reported that he "checked with the Bridgeport Police department for any reports of a fight involving Miley but could not locate one."  [*Id.*].

On February 15, 2012 the Housing Authority gave Miley notice of a pre-termination hearing and the charges against him.  On that date, Robyn Stewart met with Mr. Miley, and a letter of the same date from the Housing Authority's Executive Director, defendant Nicholas Calace, was hand-delivered to him.  [Dkt. 54-4, D's 56(a)(1) Stmt. ¶38].  The letter, entitled "Notice of Pre-Termination Hearing," notified Miley that termination of his employment was under consideration for the following reasons: (1) falsification of Housing Authority records, (2) defrauding the Housing Authority Workers' Compensation Benefit Program, and (3) violation of the public trust.  [*Id.*; Dkt. 54-3, Exh. D, 2/15/12 Letter, p.25/47].  It notified Miley that a pre-termination hearing would be held on February 17, 2012, at which Miley would have an opportunity to respond to the charges against him.  [*Id.*].

11

The letter also summarized the critical facts supporting the charges against Miley.  It reported that on September 28, 2011 Miley had submitted a physician's note stating that Miley would be absent from work for six to eight weeks due to a work injury sustained on September 20, that the information provided by Miley's physician on the September 28 visit had been "submitted on the Housing Authority's Workers' Compensation – Employee Medical and Work Status Form, which is used to report on workplace injuries," and that this physician had diagnosed Miley with a left rib fracture.  [Dkt. 54-3, Exh. D, 2/15/12 Letter, p.25/47]. The letter further noted that Miley had remained out of work as prescribed by his physician and had "received treatment and financial benefits under Workers' Compensation during that period," in addition to differential compensation pursuant to the terms of the collective bargaining agreement, until Miley's return to work on November 29, 2011.  [*Id.* at p. 25-26/47].  The February 15 letter then concluded that

> [h]owever, notwithstanding your representations to BHA [the Housing Authority] and your physician, BHA and its carrier have information that you sought and received treatment at St. Vincent's Medical Center on September 22, 2011 for the same injury.  You presented different information regarding the injury at the time of treatment.  It has since been determined that you have obtained treatment as well as benefits under Workers' Compensation by false pretenses.

[Dkt. 54-4, D's 56(a)(1) Stmt. ¶40 Dkt. 54-3, Exh. D, 2/15/12 Letter, p.26/47].

Miley admits that he received this letter during the February 15, 2012 meeting with Stewart, which took place at the end of the work day, but he was provided with no other documents at the meeting.  [Dkt. 66, P's 56(a)2 Stmnt. ¶38;

**12**

Dkt. 60-1, Miley Aff. ¶¶19, 20].  Stewart informed Miley at this meeting that he
would have an opportunity to present his case at the pre-termination hearing.
[Dkt. 54-4, D's 56(a)(1) Stmt. ¶39].  Pursuant to Calace's February 15 letter, Miley
was placed on paid administrative leave pending the pre-termination hearing and
a decision on his employment with the Housing Authority.  [Dkt. 54-4, D's 56(a)(1)
Stmt. ¶41].

At Miley's attorney's request, the pre-termination hearing scheduled for
February 17, 2012 was postponed until February 23, 2012 to allow the plaintiff and
his attorney more time to investigate and prepare.  [Dkt. 54-4, D's 56(a)(1) Stmt.
¶42].  The hearing took place in a conference room at the Housing Authority's
offices and was attended by the plaintiff, his attorney, two Union representatives,
defendant Nicholas Calace, Robyn Stewart, and the Housing Authority's attorney,
Lisa Grasso Egan.  [*Id*. at ¶43].  Plaintiff's counsel, Attorney Thornberry, brought
to the hearing copies of the St. Vincent's Medical Center emergency room reports
from Miley's visits on September 22 and 29, 2011.  [*Id*. at ¶44].  Miley also
presented at the hearing a copy of the September 15, 2011 Bridgeport Police
Department incident report in which the plaintiff reported that he had been
punched in the mouth by Travon Smith (who plaintiff affirms is his daughter's
brother) on September 13, 2011, causing a swollen upper lip.  [*Id*. at ¶45; Dkt. 66,
P's 56(a)2 Stmnt. ¶45].

At the hearing, the plaintiff was confronted with the St. Vincent's Medical
Center emergency department report from September 22, 2011, which reflected
that Miley was quoted as telling the triage nurse that he had been in a fight a

**13**

couple of days earlier and that ever since then his rib had been hurting.  [Dkt. 54-4, D's 56(a)(1) Stmt. ¶46].  It was pointed out to the plaintiff that the treating emergency room physician's History of Present Illness entry from the September 22 record stated that the plaintiff had been in a fight one week ago during which he was punched in the left ribs.  [*Id.* at ¶47; Dkt. 54-2, Exh. B, St. V's Records 9/22/11, p.19/37].  It was also pointed out at the hearing that the medical records from September 22 did not contain any information indicating that the plaintiff's rib injury was caused by an injury at work.  [Dkt. 54-4, D's 56(a)(1) Stmt. ¶48].

Miley challenged the credibility of this evidence, claiming that during his visit to the St. Vincent's emergency department on September 22, 2011 he never provided information to the triage nurse indicating that he had been involved in a fight, but rather told the triage nurse that he had been injured at work.  [Dkt. 54-4, D's 56(a)(1) Stmt. ¶49].  Miley explained that he had been speaking about the September 13 assault by Travon Smith with his daughter and then-girlfriend – who had accompanied him to the emergency room – in front of the triage nurse; he surmised that the triage nurse must have overheard that conversation and inaccurately quoted what she had overheard in the medical report.  [*Id.* at ¶50].  When confronted with the doctor's History of Present Illness section of the September 22 records, which differs from the triage nurse's description of Miley's complaint, Miley maintained that the emergency room doctor had not asked Miley how he had hurt himself.  [*Id.* at ¶51].  There is no evidence on the record that Miley offered the testimony of his daughter or his then-girlfriend at the hearing to corroborate his version of what he said to the St. Vincent's Hospital staff on

**14**

September 22nd.  Miley maintained throughout the hearing that he was injured on September 20, 2011 when co-worker Fernandez pushed upwards on a refrigerator they were carrying up a flight of stairs and the refrigerator struck Miley in his left ribs.  [*Id*. at ¶53].  Witness Miguel Fernandez was called to the pre-termination hearing and he verified that when he gave the refrigerator a push from the bottom of the stairs, the plaintiff said to him "I think I hurt my rib."  [*Id*. at ¶54].

Miley, who had previously been injured at work, admitted at the hearing that he was familiar with the procedures for work injuries.  [*Id*. at ¶55].  Nicholas Calace and Robyn Stewart attest that Miley could provide no explanation as to why he had provided his medical insurance card to St. Vincent's Medical Center on September 22, 2011.  [*Id*. at ¶55].  The parties agree that neither the plaintiff nor his attorney was provided with a copy of Harris's Summary of Investigation before or during the pre-termination hearing.  [*Id*. at ¶56].

Following the pre-termination hearing and pursuant to a request made by the plaintiff's attorney, defendant Calace granted Mr. Miley and his attorney an additional five calendar days, through February 28, 2012, to provide supplementary information to support Mr. Miley's position.  [*Id*. at ¶57].  Neither the plaintiff nor his attorney provided any additional information by February 28, 2012.  [*Id*. at ¶58].

As the Housing Authority's Executive Director, Nicholas Calace had the sole authority to decide whether to terminate the employment of a Housing Authority employee.  [*Id*. at ¶59].  In early March 2012, after discussing the matter

with Attorney Egan and Human Resources Director Stewart, Calace made the decision to discharge the plaintiff effective February 28, 2012 for falsifying Housing Authority Records in connection with submissions for insurance and claims for benefits, for workers' compensation fraud, and for violating the public trust.  [*Id.* at ¶60].  Calace recorded these reasons in a Notice of Termination letter to Miley dated March 5, 2012.[5]  [Dkt. 54-2, Exh. E, Termination Letter, p.30/37].

The five-page termination letter summarized the February 23 pre-termination hearing, including medical records from September 28 and October 11 from Miley's primary doctor as to a work injury, and the September 22 medical record demonstrating that Miley "sought and received treatment at St. Vincent's Medical Center on September 22, 2011 for the same injury.  Yet, [ ] presented different information regarding the injury at the time of treatment."  [Dkt. 54-2, Exh. E, Termination Letter, p.30/37].  The letter noted that Miley had maintained throughout the hearing that he was injured while carrying a refrigerator up some stairs on September 20, had admitted that he had reported the injury to Robbie Dunn Harris on September 27,[6] and had admitted visiting St. Vincent's Medical Center the prior week.  [*Id.* at 31/37].  The letter reported that when confronted at the hearing with the triage nursing note and the St. Vincent's emergency room physician's history note from September 22, Miley denied having reported that he

---

[5] Neither party has explained the contents of this letter in any detail in their Local Rule 56 Statements.  Because this letter is crucial to understanding the reasons for Miley's termination and the evidence presented against him, the Court will summarize it.  Both parties have submitted the letter as an exhibit and do not appear to disagree on its contents.
[6] As noted, Miley asserts that he reported his injury to Ms. Dunn Harris the day after it occurred, on September 21, 2011.

16

was injured in a fight, and instead maintained that "the Triage nurse/woman wrongfully misquoted [Miley] by typing into [his] records an actual misquote when in fact she simply overheard [Miley] talking about the fight that [he] had with" Travon Smith.  [*Id.*].  The letter also records that Miley disputed the physician's history in the September 22 medical records, even though it was noted at the hearing that the physician's comment differed from the triage nurse's.  Calace's letter states that at the pre-termination hearing Miley called witness Miguel Fernandez, who corroborated that Miley had stated that he thought he injured his rib while moving the refrigerator, and that Miley admitted his involvement in an altercation on September 20, 2011 during which he was punched in the lip, but denied any injury to his ribs.  [*Id.* at p. 32].  The letter stated that "at the conclusion of the hearing there remained no resolution regarding the basis for a Triage staff member failing to record information allegedly provided by a patient and, instead, entering erroneous information in quotations.  Likewise, there was no explanation as to how the treating physician would record similar information if you did not provide it."  [*Id.*].

Calace has affirmed – and Miley does not deny – that in making the decision to terminate the plaintiff's employment, Calace credited the September 22, 2011 St. Vincent's Medical Center emergency department report and did not find the plaintiff's story that the triage nurse failed to take down what Miley claims to be the source of his injury, but instead quoted misinformation from a casual conversation she overheard between Miley and his daughter, to be credible.  [Dkt. 54-4, D's 56(a)(1) Stmt. ¶61].  It is also undisputed that Calace did not credit either

17

the plaintiff's assertion that the emergency room physician who examined him on September 22, 2011 did not take a history from him as to how he injured himself, or his explanation that this physician's history of present illness entry had been surmised from the triage nurse's note.  [*Id.* at ¶¶62, 63].  Calace affirms that he did not find the plaintiff's claim that he injured himself at work on September 20, 2011 while carrying a refrigerator up some stairs to be credible.  [*Id.* at ¶64].  He further attests, and Miley does not deny, that in making the decision to terminate Miley's employment Calace relied "primarily on the contents of the clinical chart from Mr. Miley's visit on September 22, 2011 to the emergency room of St. Vincent's Medical Center."  [*Id.* at ¶65].  In addition, Calace affirms that he does not remember having seen Investigator Harris's Summary of Investigation memo prior to making the decision to discharge Mr. Miley, nor did he consider it in making the termination decision, assertions that Mr. Miley does not deny.  [*Id.* at ¶67].

Calace's termination letter to Miley clearly sets forth the reasons for his decision to terminate the plaintiff, which mirror his affirmations in this case.  In the "Findings and Decision" section of the letter, Calace concluded as follows:

> St. Vincent's Medical Center records clearly reflect the information that you provided to both Triage and the treating physician as the history of your illness was that you had a fight.  First, you reported to Triage that you were injured in a fight a couple of days prior, which would have been on September 20, 2011.  Similarly, you told the physician that you had been in a fight one week ago and were punched in the left rib.

[Dkt. 54-2, Exh. E, Termination Letter, p.33/37].  Calace then explained the

credibility issues he found with Miley's explanation as follows:

> In order to determine that the injury occurred at work, you would have the employer believe that you went to the Emergency Room on September 22, 2011, were misquoted by a trained professional in Triage who failed to take down anything that you actually told her for that purpose regarding the nature of your injury and the reason for your visit and, further, that she actually took down as a *quote* from you for that purpose *misinformation* from a casual conversation that you were having with your former girlfriend about a fight.  You also initially claimed a fight *never* occurred but later admitted that one did take place; however, you did not sustain the injury for which you sought treatment at the hospital.

[*Id.* at p.33/37 (emphasis in original)].  Calace continued:

> You would also have the employer believe that when you were examined by the physician, you either did not provide a history or did provide a history but did not include that you were in a fight one week prior and did not say that you were punched in the left rib in that fight.  You would have the employer believe that, in fact, this was surmised from the Triage notes, which actually referenced a fight 'a couple of days ago' and do not even mention a punch.  The explanation does not make sense.

[*Id.*].  Of Miley's contention that he was injured while moving a refrigerator on

September 20, 2011, Calace came to the following conclusion:

> Although you called your co-worker during the hearing to provide a statement regarding the nature of the incident, which you claimed lead to the injury to your left rib, there was a lack of credibility in this statement.  First, it did not appear that lifting of a refrigerator from the lower level of the stairs to the top could result in a fractured rib to the person receiving the refrigerator onto to [sic] the top step.  The description of the push to the refrigerator and lifting of it did not appear to be at an angle that would land in an individual's rib, mid-air with an individual leaned over to hold the bottom of the refrigerator, which was not on a dolly and while leaning toward the stairs to bring up the refrigerator.

[*Id.*].  Calace recorded his ultimate determination as follows:

> Based upon the information provided in the hearing, the only
> logical conclusion to be drawn is that you were injured on or
> before September 20, 2011 outside of working at [the Housing
> Authority].  You sought treatment at St. Vincent's Medical
> Center on September 22, 2011, at which time you provided
> information relevant to your injury for the purpose of
> treatment.  Both Triage and the physician noted your
> statements regarding that the injury to your left rib resulted
> from a fight.  You also submitted your regular insurance card
> for payment. . . .

[*Id.* at p.34/37].

The Union filed a timely grievance after Miley's termination, alleging that his discharge violated Article 7 of the Local 2311 Agreement because it was not supported by just cause.  [Dkt. 54-4, D's 56(a)(1) Stmt. ¶68].  The grievance was denied during the preliminary steps of the grievance procedure and was submitted by the Union for arbitration to the Connecticut State Board of Mediation and Arbitration, which has completed an evidentiary arbitration hearing before a tripartite panel of arbitrators.  [*Id.* at ¶¶69-71].  Both sides have since filed post-hearing briefs and are awaiting a decision.  [*Id.* at ¶71].  The record in this case does not contain any details of the grievance filed or of the hearing held.

## IV.    Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse,* 611 F.3d 98,

106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record,

summary judgment may lie.  *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

V.   Analysis

Miley alleges that his procedural due process rights were violated by the defendant in two ways: first, the defendant failed to provide him with material evidence prior to his pre-termination hearing, specifically, alleged statements from his co-workers regarding the source of his injury and the Summary of Investigation report prepared by Chartis's investigator Harris, and second, Executive Director Calace and Human Resources Director Stewart acted both as investigators and adjudicators of the termination of his employment, which preclude their neutrality.  [Dkt. 43, Am. Compl., Third Count].

The defendant contends that summary judgment should be granted in his favor because the alleged rumors as to the source of Miley's injury merely triggered the investigation into Miley's potential worker's compensation fraud and did not play any role in Executive Director Calace's decision to terminate him; thus, the provision of this information was unnecessary.  Similarly, Calace argues that the one-page Summary of Investigation prepared by Harris contained no material evidence unknown to Miley that played a role in Calace's decision to terminate Miley's employment, and therefore no violation of due process occurred.  Rather, Calace contends that the critical evidence in his termination decision was the September 22, 2011 St. Vincent's medical records, of which Miley was aware prior to his pre-termination hearing.  He also argues that neither

**22**

he nor Robyn Stewart acted as investigators and, moreover, the law does not mandate that Miley have been provided with a neutral decisionmaker, thus his role in Miley's termination did not violate due process.

The Fourteenth Amendment's Due Process Clause prevents state officials from depriving "any person of life, liberty, or property, without due process of law."  U.S. Const., amend. XIV, sec. 1; *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) ("the Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures.").  Determining whether a plaintiff was deprived of property without due process of law in violation of the Fourteenth Amendment is a two-step process: first, a court must identify the property interest involved; second, it must determine whether the plaintiff received constitutionally adequate process in the course of the deprivation. *O'Connor v. Pierson*, 426 F.3d 187, 196 (2d Cir. 2005).

"A public employee who has a right not to be fired without 'just cause' … has 'a property interest in his employment that qualifie[s] for the protections of procedural due process.' "  *Otero v. Bridgeport Hous. Auth.*, 297 F.3d 142, 151 (2d Cir. 2002) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)); *see also O'Connor*, 426 F.3d at 196 ("it is well established that the state-law property interest of government employees who may only be discharged for cause, such as tenured teachers, is a constitutionally protected property interest for purposes of the Fourteenth Amendment.").  It is undisputed that pursuant to the collective bargaining agreement between the Housing Authority and the

**23**

Union, Miley could not be discharged without just cause.  Thus, he had a property interest in his employment protectable by procedural due process.

The adequacy of the procedure provided depends on the "full set of pre- and post-deprivation procedures available."  *O'Connor*, 426 F.3d at 197.  As to pre-deprivation process, "[a]n essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case."  *Loudermill*, 470 U.S. at 542.  The function of a pre-termination hearing is not to definitively resolve the propriety of the employee's discharge; rather, it is "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action."  *Id.* at 545-46; *see also Faghri v. Univ. of Connecticut*, 621 F.3d 92, 99 (2d Cir. 2010) (same).  "The requisite hearing is a minimal one."  *Faghri*, 621 F.3d at 99.  Thus, "[t]he pretermination process need not be elaborate or approach the level of a full adversarial evidentiary hearing, but due process does require that before being terminated such an employee [be given] oral or written notice of the charges against h[er], an explanation of the employer's evidence, and an opportunity to present h[er] side of the story."  *Otero*, 297 F.3d at 151 (internal quotation marks and citations omitted).  *See also Loudermill*, 470 U.S. at 545-46 ("the pretermination hearing, though necessary, need not be elaborate. . . . In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action. . . . The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's

24

evidence, and an opportunity to present his side of the story.") (internal quotation marks and citations omitted).  Nor must the hearing, in all cases, be conducted before a neutral decisionmaker.  *Faghri*, 621 F.3d at 99; *Locurto v. Safir*, 264 F.3d 154, 174 (2d Cir. 2001).

Provision to the employee, however, of merely "some semblance of the evidence" against him will not suffice, however, as "some semblance" of the evidence "does not necessarily afford the accused an adequate opportunity to present her side of the story."  *Otero*, 297 F.3d at 151.  Further, "[m]ere notice of the charge … is not an explanation of the evidence and does not necessarily suffice to provide due process."  *Id*. at 152.

a.  <u>Notice of the Charges</u>

The record demonstrates, and Miley does not dispute, that he received adequate notice of the charges against him, thus satisfying the first prong of the due process analysis.  The notice requirement was satisfied by the February 15, 2012 letter from defendant Calace informing Miley that his termination was under consideration for falsification of Housing Authority records, defrauding the Housing Authority Workers' Compensation Benefit Program, and violation of the public trust.  The letter further informed Miley that notwithstanding the September 28, 2011 note and medical records from his private physician, which recorded that Miley had sustained a work injury due to which he would be absent from work, the medical records from Miley's September 22, 2011 visit to St. Vincent's Medical Center indicated that Miley had provided different information regarding

the same injury.  Miley admits that he received this letter during the February 15 meeting with Stewart notifying him that he would be the subject of a pre-termination hearing.  This letter satisfies the notice requirement prescribed by due process.

### b. An Explanation of the Employer's Evidence

Miley asserts that the Housing Authority's failure to provide Harris' Summary of Investigation to him constituted a violation of due process because that report contains four separate pieces of information to which Miley claims he was denied the opportunity to respond.  First, Harris's Summary of Investigation notes that Robyn Stewart reported that "there were rumors" that Miley had been involved in a fight, which prompted the investigation, "but no employee would give a statement."  [Dkt. 54-3, Exh. G, Harris Memo, p.39/47].  Second, the Summary notes that Robyn Stewart reported that Miley "has been the subject of prior workers comp claims and several disciplinary actions."   [*Id.*].  Third, the Summary reported that Stewart "had questions regarding the hospital report as she said St. Vincents [sic] always contacts her regarding a workers comp claim." [*Id.*].  Lastly, investigator Harris noted that he "checked with the Bridgeport Police department for any reports of a fight involving Miley but could not locate one." [*Id.*].

The defendant argues that Harris' Summary of Investigation does not contain any material evidence against Miley of which Miley was unaware and that played any role in Calace's decision to terminate Miley, and that while the

26

rumor(s) triggered the investigation into Miley's workers' compensation claim,
the entries of the triage nurse and the St. Vincent's physician from the September
22, 2011 medical records constituted the evidence substantiating the rumors that
Miley had injured his rib in a fight rather than at work and had filed a fraudulent
workers' compensation claim.  Thus, the defendant's failure to provide Miley with
the Harris report does not constitute a violation of procedural due process.  The
Court agrees.

### i.  Existence of Rumors and their Source

First, Miley contends that had he been provided with the information as to
the rumors regarding his injury at the time of his pre-termination hearing, he
would have been able to question Deputy Executive Director Blanca Carrasquillo,
who had informed Stewart of the rumors, about the source of the rumors in order
to then question the rumor's credibility.  Miley contends that he would then have
been able to question the veracity of the employee or employees perpetuating the
rumors and the employee's motives and contends that if the source of the rumor
had been his former supervisor, Jose Colon, he could have put forth evidence of
Colon's animosity toward him.  [Dkt. 59-1, P's Opp. to MSJ, pp.19-20].

Miley, however, misunderstands the nature of the Housing Authority's duty
to provide him with "an explanation of [its] evidence."  Here, the record indicates
that the rumor circulating at the Housing Authority that Miley had injured his rib
in a fight rather than at work served only to prompt the Housing Authority to
initiate an investigation into Miley's injury.  There is no evidence in the record

before this Court that this rumor or any statement of an employee propagating this rumor played any part in Calace's decision to terminate Miley or constituted evidence against Miley, nor does Miley contend that it did.  The rumor itself was not used to terminate Miley, only to initiate an investigation into potential wrongdoing which then caused *actual* documentary and inculpatory evidence against Miley to be discovered.  Even if Miley had received a detailed report of the circulating rumor and the identities of the employee or employees circulating it, and even if Miley could have proven that these employees had spread the rumor for solely malicious motives, this knowledge could not erase the existence of the September 22, 2011 St. Vincent's Medical Center emergency room records containing two separate references to the source of Miley's injuries as a fight and on which the parties agree that Calace substantially based his decision to terminate.  Miley has cited to no evidence in the record tending to demonstrate that the decision to terminate his employment was based in any way on the statements of or a rumor circulated by a particular employee or employees. Rather, he has conceded that Calace's decision turned in major part on the existence of the St. Vincent's Medical Center records, of which Miley was made aware prior to his pre-termination hearing and which Calace concluded were more credible than Miley's accusations that the medical personnel had, essentially, falsified the information in the records and which the inquiries Miley proposes could not have mitigated.  In short, informing Miley that rumors existed could not have led to the discovery of evidence that would tend to prove *or* disprove the contents of the September 22, 2011 medical record on which Calace

relied in making the termination decision.  These rumors simply did not constitute evidence about which the Housing Authority was required to provide an explanation.  *See, e.g., Locurto v. Safir*, 264 F.3d 154, 174 (2d Cir. 2001) ("the letter and the spirit of *Loudermill* … insisted only that the public employer give its employee notice of any charges and a chance to hear and respond to any evidence against him").

### ii.  Prior Workers' Compensation Claims

Miley claims that due process mandated that he have access to the Summary of Investigation's statement that Robyn Stewart had reported that Miley "has been the subject of prior workers comp claims and several disciplinary actions."  Miley asserts that this information was necessary because it "reflects that there was animosity towards the Plaintiff simply based on the fact that he had prior workers' compensation claims" and would have been necessary for him to properly raise the issue of bias at his pre-termination hearing.  [Dkt. 59-1, P's Opp. to MSJ, p.21].

The only claim remaining in this case is that Miley's procedural due process rights were violated.  Miley's ability to demonstrate or not demonstrate bias against him because of prior workers' compensation claims has no bearing on his ability to refute the documentary evidence that formed the basis of his termination: the September 22, 2011 medical records which report, in two separate places by two separate medical personnel, that Miley indicated his rib injury was sustained in a fight.   No claim for retaliation pursuant to Connecticut's

workers' compensation statute remains in this case.  Due process requires that Miley receive an explanation of the Housing Authority's evidence as to the charges against him, and there is no dispute that Miley was made aware of the September 22, 2011 medical records which constituted the Housing Authority's key evidence against him.  Any bias against Miley based on prior workers' compensation claims would not have altered the outcome of the hearing, which was based on Miley's own medical records, nor does the existence of Miley's prior workers' compensation claims constitute evidence of the charges against him, which were based on the existence of the medical records.  The failure to notify Miley that the Housing Authority was aware that he had filed previous workers' compensation claims does not constitute a violation of Miley's right to an explanation of the evidence against him.  Like the rumors as to the source of his injury, this information is not evidence of the sort contemplated in *Loudermill*.

Furthermore, Miley has presented not even a scintilla of evidence that the factual statement that he had filed previous workers' compensation claims necessitates a conclusion that the Housing Authority or Stewart could be found to have held animosity toward him.  Rather, the issue of Miley's prior workers' compensation claims was discussed at his pre-termination hearing, in the context of Miley's knowledge of the procedures for submitting such a claim.  The termination letter dated March 5, 2012 states that, at the hearing,

> Robyn Stewart asked whether [Miley] had given [his] Anthem card when at Triage [at St. Vincent's on September 22, 2011]. [He] acknowledged that [he] did.  She asked why [he] did not state that the injury was work related, which [he] had done in past instances of Workers' Compensation injuries.  [He]

> **responded that [he] had tried to clear up the misunderstanding
> several days later.**

[Dkt. 54-2, Exh. E, Termination Letter, p.31/37].  Following the pre-termination

hearing, Miley requested and the Housing Authority granted him an additional

five calendar days, through February 28, 2012, to provide further information to

support his position, but neither the plaintiff nor his attorney provided any

additional information by this date.  The termination letter indicates that Robyn

Stewart questioned Miley about his knowledge of procedure given his prior

experience with workers' compensation claims.  Miley could have questioned

Stewart about any bias he believed she held at the pre-termination hearing, and

he could have presented evidence after the hearing's conclusion in the five extra

days afforded him.  Therefore, even if Miley were entitled to know that the

Housing Authority was aware of his previous workers' compensation claims prior

to his termination, he was explicitly informed of this knowledge at the hearing

and was provided additional time to present his employer with support for his

claim, which he failed to do.  Further, there is no evidence in the record that

indicates that the notation regarding Miley's prior claims related to anything other

than his prior knowledge of the procedure surrounding injuries sustained at

work, because he apparently provided his private insurance card during his visit

on September 22, 2011.  Finally, the Court cannot discern how Miley could have

reasonably expected his employer not to have known about his employment

history, including his workers' compensation and disciplinary history.

Lastly, Miley has presented no evidence that Calace factored into his

decision Miley's prior workers' compensation claims.  Instead, the evidence

demonstrates and Miley does not deny that the key evidence against him were the clinical notations regarding his involvement in a fight as the source of his injury contained in the September 22, 2011 medical record.

The Housing Authority's failure to provide Miley with the information in Harris's report that he had made prior workers' compensation claims does not, as a matter of law, violate Miley's due process right to an explanation of the Housing Authority's evidence.  Even if it did, Miley received ample process when this information was provided to him during his pre-termination hearing and afforded time to present extra evidence post-hearing.

### iii.   Contact from St. Vincent's

Third, Miley claims that he was entitled to the Summary of Investigation's statement that Robyn Stewart "had questions regarding the [September 22, 2011] hospital report as she said St. Vincents [sic] always contacts her regarding a workers comp claim."  Miley argues that this information would have "been helpful" because he could have responded by presenting a copy of the St. Vincent's Medical Center bill reflecting that his primary insurance was workers' compensation, which ultimately paid for his hospital visit, and which would allow Miley to prove that the hospital bill was recorded as a workers' compensation claim.

For the same reasons as Miley's prior arguments fail, so must this claim. Miley has not explained and the Court cannot discern how Miley's provision of this information could possibly have assisted him in refuting the notations in his

**32**

September 22, 2011 medical records, which formed the basis for Miley's termination.  Nor has either party asserted that workers' compensation did *not* pay for his September 22 visit to St. Vincent's.  The statement simply corroborates the fact that workers' compensation paid St. Vincent's bill for treatment of an injury which Calace concluded was not work related.  The statement does not tend to establish the cause of the injury or whether Miley informed the St. Vincent's medical staff, as opposed to its billing staff, that he was in fact injured in a fight rather than at work.

Moreover, the undated bill from St. Vincent's which Miley claims he could have provided in response to this statement could not have been issued concurrently with his treatment on September 22 and thus cannot attest to what worker's compensation information, if any, Miley provided to the hospital on the date of his first visit.  The bill reflects payment by workers' compensation for Miley's September 22 visit to St. Vincent's, and it is unreasonable to assume – and Miley does not suggest – that workers' compensation paid immediately upon his visit to the emergency room on September 22.  The bill is undated and it is thus unclear *when* this bill was issued to Miley and when it was paid by workers' compensation.

Notably, the bill reflects payment by Miley's private insurer – Anthem – and also reflects a refund to Anthem in the same amount that Anthem paid, as well as recording payment by workers' compensation.  This suggests that the St. Vincent's bill was first paid by Miley's private insurer and then was refunded when workers' compensation assumed responsibility for the claim.  This

33

comports with the summary of Miley's pre-termination hearing provided in his

termination letter.  As noted above, the letter reports that

> Robyn Stewart asked whether [Miley] had given [his] Anthem
> card when at Triage [at St. Vincent's on September 22, 2011].
> [He] acknowledged that [he] did.  She asked why [he] did not
> state that the injury was work related, which [he] had done in
> past instances of Workers' Compensation injuries.  [He]
> responded that [he] had tried to clear up the misunderstanding
> several days later.

[Dkt. 54-2, Exh. E, Termination Letter, p.31/37].  The letter continues:

> [Miley] said that the hospital called you because there was a
> discrepancy in the records.  After much discussion on this
> point, it was clear that because you had been treated a second
> time at St. Vincent's Medical Center [on September 29], at
> which time you reported that you had been injured at work and
> the injury was to your left rib, the Hospital appeared to have
> found a discrepancy in the insurance reporting for the same
> injury.  It appeared to be at that time that you sought to clear
> up the discrepancy.  However, there was no indication during
> the hearing that at any time between your first and second
> visit that you tried to clear up any confusion regarding the
> nature of the visit on September 2, 2011.

[*Id.* at p.31-32/37].  The termination letter later notes that "[Miley] maintained that

the Hospital was aware of [his] claim for Workers' Compensation coverage and

that [he] had tried to clear it up right away."  [*Id.* at p.32].  Thus, the record

evidence demonstrates first that, on September 22, 2011, Miley had failed to

provide his workers' compensation information immediately, and had instead

provided his private insurance information.  The record further indicates that

Miley had, at some point after his first visit to St. Vincent's, resubmitted this claim

through workers' compensation instead.

Second, the record evidence demonstrates that Miley was involved in a discussion of the issue of payment to St. Vincent's during his pre-termination hearing on February 23, 2012.  Although he did not present the bill at his pre-termination hearing, Miley could have done so in the five days after his hearing, during which time he was allowed to present additional evidence to support his position.  Miley provided no additional information.

In sum, this bill does not tend to prove or disprove Miley's innocence of the charges against him, and does not constitute evidence of which Miley was owed an explanation.  Furthermore, Miley was involved in a discussion of this very information at his pre-termination hearing and failed to provide this bill in the five days he was afforded to do so after his hearing.  Miley was entitled to no further process as to this information.

### iv.  Investigator Competence

Lastly, Miley contends that due process necessitated the provision of Harris' Summary of Investigation because Harris indicated that he "checked with the Bridgeport Police department for any reports of a fight involving Miley but could not locate one."  Miley argues that because a police report indeed existed, he could have called into question Harris' investigatory work and the conclusions he reached against the plaintiff.  The defendant, on the other hand, asserts that Harris' competence as an investigator is irrelevant as the key evidence against Miley – the September 22, 2011 medical record – was not dependent upon the thoroughness of Harris' investigation.  The Court agrees.

Investigator Harris' competence has no bearing whatsoever on the evidence against Mr. Miley, and calling into question Harris' investigatory prowess would have no effect on the contents of the September 22, 2011 medical records which formed the bulk of his employer's evidence against him.  Harris' competence is simply not evidence.  In addition, Miley brought to and presented at his pre-termination hearing the September 15 police report which indicated he had been involved in a fight on September 13, 2011 and had sustained a lip injury.  Furthermore, Miley does not deny that Calace had not received Harris's Summary of Investigation at the time of the pre-termination hearing, nor that Calace did not consider it in the decision to terminate Miley's employment.  Thus, the record indicates that Harris' competence played no part in the defendant's decision to terminate Miley.  The failure to provide information calling into question Harris' competence does not constitute a violation of Miley's right to an explanation of the Housing Authority's evidence against him, as Harris' competence does not constitute evidence, and would not have altered the outcome of the pre-termination hearing.

### v.  Explanation of the Evidence Provided to Miley

The record in this case clearly indicates that Miley received a fulsome explanation of the Housing Authority's evidence and that this explanation comported with due process requirements.  As noted, Calace's February 15, 2012 letter informing Miley of his pre-termination hearing explained that the basis for the charges against Miley were Miley's representations about his injury in the September 22, 2011 St. Vincent's medical record.  During the pre-termination

**36**

hearing on February 23, 2012, the key evidence against Miley was the September 22 medical record in which both a triage nurse and the treating emergency room physician noted that Miley had sustained his rib injury in a fight.  Miley admits that his attorney brought a copy of this medical record to the pre-termination hearing and admits that Calace's decision to terminate him was primarily based on the content of this clinical record.  Discussion at the hearing focused on the notations in the medical record and the absence in this record of any indication that Miley's injury was caused at work.  Miley maintained throughout the hearing that he told the triage nurse that he had been injured at work and that this nurse must have gleaned the information about a fight from a conversation she overheard Miley having with his daughter in the emergency room and in front of the nurse, and had then misquoted him in her chart notations.  He further maintained that the emergency room doctor had not asked him how he had hurt himself, but rather must have surmised the information about a fight from the triage nurse's notation, although he could not explain why the nurse's and the doctor's notations had differed.  Instead, Miley insisted during the hearing that he had been injured at work on September 20, 2011 when his coworker had pushed a refrigerator upwards, striking him in the rib.  Discussion during the hearing also included Miley's familiarity with the procedures for making workers' compensation claims.

The termination letter sent by Calace to Miley after his pre-termination hearing reflects that the main reasons for his termination were Miley's representations recorded in the September 22, 2011 medical record from St.

Vincent's.  As noted previously, this letter recorded that, at the conclusion of the pre-termination hearing, "there remained no resolution regarding the basis for a Triage staff member failing to record information allegedly provided by a patient and, instead, entering erroneous information in quotations.  Likewise, there was no explanation as to how the treating physician would record similar information if you did not provide it."  [Dkt. 54-2, Exh. E, Termination Letter, p.32/37].  Calace concluded in the "Findings and Decision" section of the letter that St. Vincent's Medical Center records clearly reflect that Miley told both the triage nurse and the treating physician that he injured his rib in a fight.  [Dkt. 54-2, Exh. E, Termination Letter, p.33/37].  Calace then explained, as quoted above, that he found Miley's explanation of these notations to be patently unbelievable.  [*Id*.].  Finally, the termination letter stated Calace's conclusion that, based upon the information provided in the hearing, the only logical conclusion was that Miley was injured on or before September 20, 2011 outside of work.  [*Id*. at p.34/37].

It is thus clear that the Housing Authority's primary evidence against the plaintiff was the September 22, 2011 St. Vincent's medical record and the clinical notations about the source of Miley's injury that both the Triage nurse and the treating physician attributed to Miley himself.  That Miley was unable to convince the hearing officer that these two independent notations were erroneous has no bearing on the fact that Miley received sufficient explanation of this evidence prior to and during his pre-termination hearing.  Miley's feeble attempts to construe non-evidence in Harris' Summary of Investigation as material evidence that could have changed the outcome of the pre-termination hearing also does

not change this fact.  The Housing Authority's explanation of its evidence more than meets the requirements for due process.

To the extent that Miley relies on the Second Circuit's decision in *Otero v. Bridgeport Hous. Auth.*, 297 F.3d 142 (2d Cir. 2002), Miley's reliance is misplaced as the facts in *Otero* are easily distinguished from those in this case.  The plaintiff in *Otero*, a public employee of the Bridgeport Housing Authority, was accused of stealing a toilet from her employer.  She was ultimately terminated after several hearings, but was never informed of the existence of co-worker affidavits or their contents, including one which stated that the affiant had installed the missing toilet in the accused employee's house, and another of which contained three contradictory stories about the affiant's handling of the missing toilet.  The Second Circuit observed that had the employee been shown or told of the contents of the first affidavit, "she might have been able to refute it simply by showing that the toilet in fact was not installed at her house."  *Otero*, 297 F.3d at 151.  Had the plaintiff been shown the second contradictory affidavit, she could have pointed out the obvious inconsistencies in the affiant's statements underlying the accusation against her.  *Id.* at 152.  The Second Circuit concluded that the plaintiff had essentially only been informed of the charge against her – that she had stolen a toilet – and had not been given an explanation of the evidence that supported the charge, which was insufficient to comport with due process, thus holding that "[m]ere notice of the charge ... is not an explanation of the evidence and does not necessarily suffice to provide due process."  *Id.*

39

No material exculpatory or culpatory evidence upon which Calace relied was withheld from Miley.  Although Miley contends that he was disadvantaged because he was not provided with Harris' Summary of Investigation, nothing in the Summary of which Miley was unaware constituted evidence against him that the Housing Authority was obligated to disclose.  Nor would any of the information of which Miley was unaware have been exculpatory or capable of changing the outcome of the pre-termination hearing.  The plaintiff in *Otero* was denied access to relevant and material evidence relating to the charge against her, and was instead provided with mere notice of the charge that she had allegedly stolen a toilet.  While the *Otero* plaintiff could have provided a response to this evidence that could have negated the charge against her entirely and proven her innocence, none of the additional information that Miley claims he could have provided in response to the Harris report could have exonerated him or mitigated the damage done by the clinical notations in the September 22, 2011 medical records, which constituted the evidence underlying the charge that Miley had committed workers' compensation fraud and belied the public trust.  Nothing in the Summary of Investigation prevented Miley from fully presenting his side of the story.

Consequently, the record overwhelmingly indicates that Miley was afforded sufficient explanation of the Housing Authority's evidence underlying the charges against him before the hearing.  He was also given additional time after the hearing, at which all of the evidence on which Calace relied was disclosed, to supplement his evidence.  Summary judgment is GRANTED in favor of the

**40**

defendant on Miley's claim that he was denied an explanation of the evidence against him.  *See, e.g.*, *Saltarella v. Town of Enfield*, 427 F.Supp.2d 62, 74 (D. Conn. 2006) (holding that requirement that employee be given an explanation of the evidence against him was met when employee was given thirty minutes at his pre-termination hearing to read and review the evidence against him.), *aff'd*, 227 F. App'x 67 (2d Cir. 2007).

      c. <u>Opportunity to be Heard</u>

      Although Miley contends that his lack of access to the Harris report deprived him of an opportunity to be heard, the record indicates that Miley was afforded a pre-termination hearing that met the requirements of due process.  As noted, Miley was notified of the pre-termination hearing on February 15, 2012.  He requested and was afforded a six-day postponement of the hearing, until February 23, 2012, to allow for more time to investigate and prepare.  At the pre-termination hearing, Miley was afforded an opportunity to present evidence in his favor; he maintained that his rib injury did not result from a fight and presented the September 15, 2011 police report to support his assertion.  The plaintiff was also afforded the opportunity to call witnesses on his behalf, and Miley called his co-worker, Miguel Fernandez, to testify about the injury he allegedly sustained while moving a refrigerator on September 20, 2011.  As noted previously, the parties engaged in detailed discussion of the September 22, 2011 St. Vincent's medical records.  Following the pre-termination hearing and pursuant to a request made by the plaintiff's attorney, defendant Calace granted Mr. Miley and his attorney an additional five calendar days, through February 28, 2012, to

provide further information to support Mr. Miley's position.  Neither the plaintiff nor his attorney provided any additional information by February 28, 2012.

It is well settled that the existence of post-deprivation procedures also inform the necessary scope of the pre-deprivation process.  *See Loudermill*, 470 U.S. at 546 ("Our holding rests in part on he provisions in [the applicable state] law for a full post-termination hearing"); *Sutton v. Hughes*, 3:06CV1333 (CFD), 2009 WL 2208080 (D. Conn. July 22, 2009) ("[t]he availability of post-termination proceedings is also relevant to the necessary scope of the pre-termination procedures, regardless of whether they are pursued.").  Miley was entitled to and indeed utilized the post-deprivation grievance procedures afforded to him pursuant to the Local 2311 Collective Bargaining Agreement, and has, after the denial of his grievance, further pursued his claim with the Connecticut State Board of Mediation and Arbitration.  Miley was afforded a full evidentiary hearing before a tripartite panel of arbitrators.  Miley does not contend that these post-deprivation procedures failed to meet the requirements of due process.

Consequently, these pre- and post-deprivation procedures have more than met the limited requirements for Miley to have an opportunity to be heard prior to the deprivation at issue.

### d.  Unbiased Decision-Maker

Miley also contends that his due process rights were violated because he was denied access to a hearing before a neutral arbitrator and the hearing officers at his pre-termination hearing performed the dual functions of advocates

and adjudicators.  In support, Miley asserts that Nicholas Calace and Robyn Stewart performed both investigative and decision-making duties.  Although Miley fails to explain this argument further, he has cited to the Notice of Pre-Termination Hearing letter signed by Calace and delivered to Miley on February 15, 2012, and to the Notice of Termination letter signed by Calace on March 5, 2012.  [Dkt. 59-1, P's Opp. to MSJ, pp. 30-31].  The defendant argues that neither Stewart nor Calace performed dual functions and that, even if they did, Miley was not entitled to a hearing before an impartial decision-maker.  Miley's argument must fail.

The Second Circuit has held that a neutral adjudicator is not "a necessary component of due process at a pre-termination hearing" of a public employee where the employee is afforded, "subsequent to his termination, a full adversarial hearing before a neutral adjudicator."  *Locurto v. Safir*, 264 F.3d 154, 174 (2d Cir. 2001).  The *Locurto* court enunciated two reasons for its conclusion:

> First, such a requirement would run contrary to the letter and the spirit of *Loudermill*, which insisted only that the public employer give its employee notice of any charges and a chance to hear and respond to any evidence against him. We fully agree with the view that the costs to the state of additional pre-deprivation guarantees (in this case, a neutral adjudicator) outweigh possible benefits to the employee, given the availability of a full post-deprivation hearing. Second, every circuit that has addressed this question has reached a conclusion similar to the one we reach.

*Id.* (citations omitted) (collecting cases).  The Second Circuit has recently affirmed this conclusion and courts in this Circuit dismiss similar claims where post-deprivation remedies afford a plaintiff a full adjudicatory hearing before a

neutral decision-maker.  *See Leary v. Civil Serv. Empls. Ass'n Region 3*, 516 F. App'x 42, 43 (2d Cir. 2013) (holding that basis of appeal – that pre-termination hearing did not satisfy due process because hearing officer was biased, having been appointed and paid for by the employer – was foreclosed by the precedent in *Locurto*, in which the court "explicitly rejected a virtually identical argument, explaining that a pre-termination hearing for public employees does not require a neutral adjudicator"); *Crowley v. Burlington Elec. Dep't*, 2:13-CV-00205-WKS, 2014 WL 237034, at *10 (D. Vt. Jan. 22, 2014) (although a pre-termination hearing is "possibly the only meaningful opportunity to invoke the discretion of the decisionmaker prior to termination … a neutral adjudicator is not required in a pre-termination hearing as long as a full adversarial post-deprivation hearing is provided") (internal quotation marks and citation omitted); *Jones v. Cnty. of Westchester, Dep't of Envtl. Facilities*, 12 CV 9449 VB, 2013 WL 3305798 (S.D.N.Y. June 26, 2013) ("[t]he Second Circuit has made clear that 'a neutral adjudicator is [not] a necessary component of due process at a pre-termination hearing.' Because plaintiff's due process claim is based solely on the fact that a neutral adjudicator did not preside over his pretermination hearing, that claim is dismissed.") (citing *Locurto*, 264 F.3d at 174).

Here, the post-deprivation remedy afforded to the plaintiff included a full evidentiary hearing before a tripartite panel of arbitrators who the plaintiff does not claim to have been biased, and in which Miley could have challenged Stewart's and Calace's neutrality.  Conn. Agencies Regs, §§ 31-91-1, *et seq*.  Miley has not disputed the propriety of the procedures afforded him post-termination.

Accordingly, Stewart's and Calace's neutrality is of no consequence and plaintiff has suffered no deprivation of his due process rights, as he has been provided and has utilized his adequate post-deprivation hearing procedures.  *See, e.g., Locurto*, 264 F.3d 154 (failure to afford neutral adjudicator at pre-termination hearings for city police officer and city firemen did not violate procedural due process, given availability of adequate post-deprivation hearing under New York's Article 78); *see also Leary, Crowley, Jones, supra*.

However, even if Miley were entitled to be heard by a neutral adjudicator, there is no evidence in the record to suggest that Stewart or Calace performed the dual functions of investigation and adjudication that Miley contends.  Rather, the evidence demonstrates that the investigation was conducted by James Harris, who was employed by the Housing Authority's workers' compensation carrier, Chartis, and that Stewart performed, at most, the role of the prosecuting official during Miley's pre-termination hearing, which included confronting Miley with the evidence against him and questioning Miley.  There is no indication that she made the decision to terminate Miley, and Miley has presented no evidence demonstrating that she did.  Calace, on the other hand, acted as the hearing adjudicator and possessed the sole authority over the decision to terminate Miley.  Nothing in the record suggests that Calace performed any investigation into the charges against the plaintiff.  The only evidence to which Miley has cited are the two letters Calace sent to him.  The first, which notified Miley of the charges against him and advised him that he would be the subject of pre-termination hearing, does not indicate that Calace performed any investigative

45

function.  It demonstrates only that Calace, as the Housing Authority's Executive Director, was advised of the evidence against Miley and notified him of the per-termination hearing to which he was entitled.  Calace's second letter, which notified Miley of his termination and the reasons therefore after his pre-termination hearing, explained the evidence against Miley and the conclusions Calace drew from the evidence, which is precisely the function of a hearing official.  In sum, nothing in the record indicates that the pre-termination or post-termination processes afforded to Miley were not neutral.

Summary judgment is GRANTED in favor of the defendant on this prong of Miley's Fourteenth Amendment claim for denial of due process.

VI.   <u>Conclusion</u>

In conclusion, as a matter of law, Miley suffered no deprivation of his due process rights.  None of the information in Harris' Summary of Investigation to which the plaintiff claims he was entitled constitutes the Housing Authority's evidence as to the charges that Miley falsified records, committed workers' compensation fraud, or violated the public trust.  This information would have altered the outcome of the hearing in any way and could not have refuted the evidence against Miley, nor does the record reflect that defendant Calace, who made the decision to terminate Miley, possessed or used the information that Miley claims would have made a difference in his case.  Nor does any evidence in the record support Miley's claim that he was denied a hearing before an impartial

fact finder and decision maker.  Miley received process prior to his termination that adequately comported with his Fourteenth Amendment right to due process.

For the foregoing reasons, defendant's Motion for Summary Judgment is GRANTED.  The Clerk is directed to enter judgment in favor of the defendants and to close the case.

IT IS SO ORDERED.


_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: February 7, 2014

47